UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------------X    Case No. 1:26-cv-04613

RACHEL SONNTAG,

                                 **COMPLAINT**

             Plaintiff,

           -against-                     **PLAINTIFF DEMANDS A**
                                       **TRIAL BY JURY**

NYU LANGONE HEALTH SYSTEM and DR. BRENT
LLERA, *In His Individual and Official Capacities*,

             Defendants.

---------------------------------------------------------------------------X

      Plaintiff, RACHEL SONNTAG, by and through her attorneys, PHILLIPS & ASSOCIATES, PLLC, hereby complains of Defendants, upon information and belief, as follows:

### NATURE OF THE CASE

1.    Plaintiff complains pursuant to the discrimination and retaliation provisions of **Title VII of the Civil Rights Act of 1964**, as amended, 42 U.S.C. § 2000e *et. seq.* ("Title VII"), the **New York State Human Rights Law**, New York State Executive Law, § 296 *et. seq.* ("NYSHRL"), and **New York City Human Rights Law**, New York City Administrative Code § 8-107, *et. seq.* ("NYCHRL") together with intentional infliction of emotional distress and any other claim(s) that can be inferred from the facts set forth herein and seeks damages to redress the injuries Plaintiff has suffered as a result of being harassed and discriminated against on the basis of her gender (female) together with sexual harassment, creating a hostile work environment, and retaliation.

### JURISDICTION AND VENUE

2.    Jurisdiction of this Court is proper under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. §§ 1331 and 1343.

1

3. The Court has supplemental jurisdiction over the claims of Plaintiff brought under state and city law pursuant to 28 U.S.C. § 1367.

4. Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b), based upon the fact that the claims alleged herein took place within the Southern District of New York.

## PROCEDURAL PREREQUISITES

5. By: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 11, 2025, (b) receiving a Notice of Right to Sue from the EEOC on March 10, 2026, (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as **"Exhibit A;"** a copy of the transmittal letter to the NYCCHR *et ano.* is annexed hereto as **"Exhibit B."**

## PARTIES

6. At all times relevant hereto, Plaintiff was a resident of the State of New York and County of Queens.

7. At all times relevant hereto, Defendant NYU LANGONE HEALTH system ("Defendant NYU") was and is a domestic not-for-profit corporation which was authorized to conduct business, and does conduct business, under the laws of the State of New York.

8. At all times relevant hereto, Defendant NYU operates several health facilities across the New York metropolitan area.

9.   At all times relevant hereto, Defendant NYU has a principal place of business located at 550 First Avenue, New York, NY 10016.

10.   At all times relevant hereto, Plaintiff was and is an employee of Defendant NYU.

11.   Defendant NYU is an employer under Title VII, the NYSHRL, and the NYCHRL.

12.   At all times relevant, Defendant BRENT LLERA ("Defendant LLERA") was and/or is a surgical resident for Defendant NYU. In his role, Defendant LLERA was able to affect the terms and conditions of Plaintiff's employment.  Defendant LLERA is being sued herein in his individual and official capacities.

13.   Defendant NYU and Defendant LLERA are collectively referred to as "Defendants."

## MATERIAL FACTS

14.   On or about December 6, 2021, Plaintiff began her employment with Defendant NYU as a "Registered Nurse" with a corresponding annual salary of $102,000.00.

15.   Throughout her employment, Plaintiff was an exceptional employee and performed all of her duties without issue.

16.   Plaintiff's current annual salary is approximately $152,000.00.

17.   Plaintiff was assigned to work at Defendant NYU's health facility located at 550 First Avenue, New York, New York 10016.

18.   Plaintiff would also work at Defendant NYU's health facility located at 259 First Street, Mineola, New York 11501.

19.   From approximately December 2021 until February 2023, Plaintiff's supervisor was Samantha Costa ("Ms. Costa"), who had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment.

20. From approximately February 2023 until February 2025, Plaintiff's supervisor was Elizabeth Stanley ("Ms. Stanley"), who had the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment.

21. From approximately February 2025 to the present, Plaintiff's supervisor has been Alisha Parikh ("Ms. Parikh"), who has the authority to hire, fire, or affect the terms and conditions of Plaintiff's employment.

22. Shortly after beginning her employment, Plaintiff was subjected to an incessant campaign of sexual harassment.

23. In or around early winter 2022, Plaintiff met two of Defendant NYU's surgical residents, Defendant LLERA and Dr. Randi Harris ("Dr. Harris").

24. From the onset of their working relationship, both physicians (Defendant LLERA and Dr. Harris) were overly friendly and acted towards Plaintiff in an inappropriate manner.

25. For example, while at her nursing station completing chart notations, Defendant LLERA would stare at Plaintiff attempting to garner her attention.

26. Plaintiff would ignore the unwanted attention and continue with her work.

27. On one occasion, Dr. Harris stood extremely close to Plaintiff, making her very uncomfortable. He asked for her personal telephone number which she did not want to provide him.

28. After being very persistent and aggressive, Plaintiff finally told Dr. Harris that she would just take his number instead.

29. The following morning, Dr. Harris approached Plaintiff and asked her why she hadn't texted him since he had provided her with his number the preceding day.

4

30. Unsure how to respond and not wanting to make things uncomfortable at work since she knew she had to continue to work alongside him, Plaintiff texted Dr. Harris her name.

31. Dr. Harris responded and kept asking Plaintiff to hang out with him on multiple occasions.

32. Plaintiff had no interest in pursuing a personal relationship with Dr. Harris.

33. Each time Dr. Harris texted or approached her about "hanging out" or spending any time together outside of work hours, Plaintiff rebuffed him.

34. In or around January 2022, during an orientation session, Plaintiff complained to nursing supervisor Rachel Torres ("Ms. Torres") about the sexual harassment she was experiencing at the hands of Defendant LLERA and Dr. Harris.

35. **Instead of taking Plaintiff's complaint seriously and conveying sympathy, Ms. Torres callously remarked, "I don't know why they keep trying to flirt with you. I don't see the big deal over you."**

36. **Shortly thereafter, a fellow nurse, Michelle B. (last name currently unknown) approached Plaintiff and told her that she knew of someone who was interested in her, Defendant LLERA, asking if she wanted to "have a good time with him."**

37. Plaintiff was upset by the sexual overture and told Michelle B. that she found it unprofessional to have a sexual relationship at work. Further, she relayed that she was extremely uncomfortable and disturbed that Michelle B. would actively promote an encounter to a new colleague.

38. In or about winter of 2022, Michelle B. falsely reported to their Nurse Manager that Plaintiff had deliberately failed to give a report on a new patient.

39. Plaintiff has a sincerely held belief that Michelle B. purposefully attempted to get Plaintiff in trouble in retaliation for opposing Michelle B.'s attempts to involve her in a relationship with Defendant LLERA.

40. Plaintiff told the Nurse Educator, Waitline Williams, about the manner in which Michelle B. had treated her after rebuffing a personal relationship with one of the surgical residents, Defendant LLERA.

41. In or around February 2022, due to a major snowstorm in the forecast, Defendant NYU offered housing to their employees scheduled to work the next morning as an alternative to driving home and having to return in inclement weather.

42. **The other surgical resident that Plaintiff worked with, Dr. Harris, asked her if she would like to come down to the on-call room with him instead of staying in the housing provided by the hospital.**

43. **Dr. Harris told Plaintiff that he could keep her "really, really warm."**

44. **Shocked, Plaintiff immediately declined.**

45. In response, Dr. Harris merely laughed at her comment and walked away.

46. A few days later, Dr. Harris called Plaintiff on her cell phone while blasting a song in the background with lyrics that included, **"Call me if your man don't fuck you good, better you fuck somebody else..."**

47. Plaintiff asked Dr. Harris if there was a reason he was playing that particular song so very loudly.  He responded, **"You know exactly why!"**

48. Plaintiff firmly told Dr. Harris that she was not interested in pursuing a relationship with him.

49. **In or around March 2022, Dr. Harris approached Plaintiff while working and showed her sexual pictures of a woman he was dating. Dr. Harris then asked Plaintiff if she found the woman attractive.**

50. **Dr. Harris's unwanted sexual comments continued when he asked Plaintiff if she was bisexual or had ever been in a "threesome."**

51. Upset, Plaintiff responded no, and that even if she had, it would never be with him because she knew him to be promiscuous. Dr. Harris had a reputation for having sexual relations with multiple nurses, behavior she found repulsive.

52. Dr. Harris's incessant sexual harassment continued.

53. For example, Dr. Harris began texting Plaintiff aggressively asking her to reveal who was spreading rumors about him sleeping around and who were the nurses he was supposedly intimate with.

54. Plaintiff continued to ignore Dr. Harris and refused to engage in his conversational ploys, assertively telling him that she was not interested in him.

55. As Dr. Harris was badgering Plaintiff with unwanted interest, so too was Defendant LLERA.

56. For example, Defendant LLERA would stare at Plaintiff and then approach her at the nurses' station to ask her personal questions.

57. Plaintiff did her best to remain professional while impressing upon Defendant LLERA that she had no interest in him outside of work.

58. In or around summer 2022, Defendant LLERA messaged Plaintiff utilizing Defendant NYU's medical records system (Epic) chat portion which is intended for secure communications regarding patient care.

59. Defendant LLERA messaged Plaintiff soon after she had informed him that she found him to be rude to both herself and others amongst the nursing staff.

60. Defendant LLERA's 'Epic' chat message communicated that he wanted to see her if she was at work that day and that he would never be mean to her again.

61. Plaintiff interpreted the message as an apology but was wary because Defendant LLERA's demeanor often changed from rude to overly friendly, inappropriate, and flirtatious without warning.

62. r example, Defendant LLERA would ask Plaintiff about her family and then make unsettling comments, such as: "Your family are police officers so if I ever did anything wrong to you..." trailing off without explanation.

63. In or around winter 2023, Plaintiff transferred from the Medical Surgical Unit to the Medical Intensive Care Unit (MICU).

64. Upon learning of the transfer, Defendant LLERA asked Plaintiff why she was "going to work in the graveyard" (referring to the MICU). She told him it was to broaden her knowledge base in preparation for continuing her education.

65. Defendant LLERA mockingly replied, "**What? So you can be little Nurse Practitioner like everyone else?**"

66. **In or around Spring 2022, a patient's family member sexually harassed Plaintiff by saying to her, "I wish I could spread you on the table and eat you."**

67. Plaintiff immediately reported the incident to her Assistant Nurse Manager Mario, (last name currently unknown), who reported it to security staff. The patient's family member was then banned from returning to the facility.

68. Afterward, a co-worker, Gail (last name currently unknown), yelled at Plaintiff exclaiming, "**I don't know why you are making such a big deal about nothing!**"

69. Following this incident, Plaintiff became reluctant to lodge any further complaints of sexual harassment to Defendant NYU.

70. Over the course of two years working in the MICU, Plaintiff was sexually harassed multiple times by patients and/or their family members, as well as by Defendant LLERA.

71. Plaintiff did report to Defendant NYU some of the more egregious and outlandish sexual offenses that she was forced to endure at the health facility.

72. **For example, a patient took pictures of Plaintiff without her consent, stating that he wished he had a penis transplant.**

73. **Another example of patient inappropriate behavior were jokes made such as "I watched a hooker fall and asked how's her head? I don't get any complaints!" or "I arrived at my pre-ejaculation meeting early and they said I come too quick!"**

74. Plaintiff reported these sexually offensive comments to Assistant Nurse Manager, Kathy Daivs ("Ms. Davis").

75. Instead of escalating her complaints to Human Resources or other Defendant NYU's management staff, Plaintiff was often chided and told she needed to learn how to take a joke.

76. In or around May 2023, Defendant LLERA asked Plaintiff how things were going in the MICU. She casually replied that she was still adjusting to her new unit and new city.

77. Defendant LLERA asked, "**You live in Astoria, right?**"

78. Taken aback that Defendant LLERA knew where she had moved to just the month prior, she assumed he must have overheard co-workers mention it.

79. **However, Plaintiff quickly became alarmed when Defendant LLERA started describing the exact buildings and restaurants near her block. He told her he "was always in [her] part of town and could show [her] some nice places."**

80. Again, Plaintiff tried to steer conversation to a more professional track and told him she was not interested in him and that she had a romantic partner.

81. Defendant LLERA was undeterred and kept insistently repeating, "**No, you don't. No, you don't**" while shaking his head.

82. Plaintiff was deeply disturbed by Defendant LLERA's behavior, recognizing that his knowledge of her neighborhood meant he had been stalking her.

83. Plaintiff walked away, telling Defendant LLERA that she had to get back to work.

84. In or around February 2024, Defendant LLERA consulted on a patient Plaintiff was treating. Plaintiff had been avoiding interactions with Defendant LLERA as much as possible up to that point.

85. Plaintiff was busy with the critically ill patient, but she could feel Defendant LLERA staring at her.

86. After the patient stabilized, Plaintiff went to the nursing station. Defendant LLERA followed her and sat down next to her.

87. Disturbed, Plaintiff moved as far away from him as physically possible.

88. Defendant LLERA asked her, "**So how's everything with your supposed boyfriend?**" Plaintiff replied that things were great and that she was planning a romantic getaway for his birthday.

89. Defendant LLERA, visibly upset, responded, "**Listen if you were my girl you wouldn't have to do all that! I would take care of you! You wouldn't even have to work!**"

90. Plaintiff replied, "I love him. I do what I do out of love. I love my job as well." She then got up and walked away, unwilling to engage with Defendant LLERA any further.

91. Plaintiff went back to the patient's room to administer medication, and she could feel Defendant LLERA glaring at her, waiting for her to return.

92. As Plaintiff exited the patient's room, Defendant LLERA yelled out, **"Look at you! You don't even like this job!"**

93. Shocked and upset by the outburst, Plaintiff walked over to Defendant LLERA and asked him to lower his voice, telling him, "Of course some days are better than others, but I am grateful for this opportunity to work in the ICU. I need ICU experience to go back to school."

94. Defendant LLERA then began questioning Plaintiff about her boyfriend, asking intrusive questions about his occupation, workplace, and income.

95. Annoyed, Plaintiff told Defendant LLERA again that she was not interested in him nor attracted to him, and that she thought he was rude and arrogant.

96. Plaintiff told Defendant LLERA that because of his behavior toward other nurses, many people in their former unit did not like him.

97. Defendant LLERA angrily responded, **"Those hoes don't deserve to talk to me anyways!"**

98. Defendant LLERA became vulgar asking, **"Did you ever fuck Randy (Dr. Harris)!?!"**

99. Plaintiff was shocked and appalled by his question, responding, **"Absolutely not!"**

100. Defendant LLERA looked relieved and said, "Let me take you out." He continued to comment that if Plaintiff were "his girl," he knew the best Italian, French, and Japanese restaurants to take her to.

101. The conversation made Plaintiff exceedingly uncomfortable, so she called a co-worker, Nandy DeLaCruz ("Ms. DeLaCruz"), and they went to the break room.

11

102. Ms. DeLaCruz offered Plaintiff empanadas, and she ate one while carrying another over to the nursing station where Defendant LLERA seemed to be waiting for her return.

103. **Defendant LLERA looked up and told Plaintiff, "I want you to feed me. You're really not going to feed me?" Plaintiff hesitantly reached out, handing him the empanada.**

104. **Defendant deliberately slowly brushed her hand as he took the food from her saying, "Now, tell me you love me."  Plaintiff replied, "Um, what!?!"**

105. **Defendant LLERA looked Plaintiff in the eye for a long moment, said, "I love you," and walked away.**

106. Plaintiff complained about Defendant LLERA's unrelenting sexual advances to a senior nurse in charge of her unit, Audrey Sansculotte ("Ms. Sansculotte").

107. Notably, Ms. Sansculotte had witnessed Defendant LLERA asking Plaintiff out.

108. **Again, Plaintiff found little support from Defendant NYU's supervisory staff. Ms. Sansculotte responded to her, "Maybe you should change your scrubs and tie your hair tighter to your head."**

109. **Plaintiff felt Ms. Sansculotte was insinuating that the doctors' unwanted attentions were somehow her fault.**

110. **Plaintiff then went to the bathroom and heard Ms. Sanscoulotte scream loudly, "Whore!" at Plaintiff.**

111. **Upon returning to the nurses' station, there was a note left for her that read, "You are a whore and I'm going to tell your boyfriend."**

112. On or about July 27, 2024, Plaintiff witnessed a co-worker being sexually harassed and reported the incident to Assistant Nurse Manager, Atara Marzouk.

113. Defendant NYC's meager response was to require staff to complete online training modules on sexual harassment.

114. Several of Plaintiff's co-workers, displeased with her report of harassment to management, began treating her in a hostile and disparate manner.

115. The sexual harassment and hostile work environment affected Plaintiff's mental health and well-being.

116. Plaintiff sought medical treatment for her serious health condition.

117. In or about early 2025, Plaintiff became aware that Defendant LLERA was no longer working at Defendant NYU and possibly suspended or terminated from the surgical residency program.

118. On or about March 21, 2025, Plaintiff met with Debra Albert ("Ms. Albert"), Chief Nursing Officer, and Defendant NYU's Senior Director, Compliance and Privacy, Sarah McIntee ("Ms. McIntee") to discuss Defendant LLERA's situation. Plaintiff was seeking assurances that she would no longer have to work with him.

119. Dr. Harris was no longer a concern, as he had completed his surgical residency and left Defendant NYU to pursue his fellowship at another hospital system.

120. At the meeting, Ms. Albert and Ms. McIntee apologized for the sexual harassment Plaintiff had endured because of Defendant LLERA's behavior.

121. Plaintiff asked them if he had sexually harassed anyone else and Ms. Albert and Ms. McIntee confirmed that there were other victims.

122. Ms. Albert and Ms. McIntee asked Plaintiff not to speak about incidents to anyone else as an investigation was still ongoing.

123. Plaintiff was told that Defendant LLERA was appealing against the residency termination decision and the appeal process could take several weeks to a few months.

124. In an email, Ms. McIntee confirmed that Defendant LLERA had started the appeal process about 3-4 weeks prior to Defendants NYU notifying Plaintiff about it.

125. Plaintiff told Ms. McIntee and Ms. Albert that she was deeply disturbed and wanted to know if anyone would contact her if Defendant LLERA was allowed to resume his residency status and continue to work there.

126. Plaintiff was told at the meeting that Defendant LLERA had illegally, unnecessarily, and improperly accessed her private medical information on at least five separate occasions that Defendant NYU was aware of.

127. During this meeting, Defendant NYU admitted to Plaintiff that they failed to properly safeguard her private, personal, and medical information from Defendant LLERA and that they failed to prevent Defendant LLERA from repeatedly cyberstalking her.

128. On or about March 21, 2025, Plaintiff started a medical leave of absence due to her serious medical conditions and distress over Defendant LLERA's possible return to work.

129. On or about April 3, 2025, Plaintiff submitted FMLA paperwork to Defendant NYU in support of her medically necessary leave of absence.

130. Plaintiff's treating psychiatrist, Dr. Gaelle Dennery, completed the FMLA Certification stating that she should be on leave for the period March 21, 2025, through June 14, 2025, noting: "Client is reporting symptoms of anxiety, panic attacks and PTSD. She reports onset of symptoms on March 21, 2025, following an incident involving a surgeon who accessed her personal information inappropriately. This has led to ongoing paranoia, hypervigilance, sleep disturbances and significant functional impairments."

131. Plaintiff was unlawfully treated, humiliated, degraded, victimized, and embarrassed. As a result, Plaintiff suffers loss of rights, emotional distress, and physical ailments.

132. Defendant NYU's actions and conduct were intentional and intended to harm Plaintiff.

133. As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses. Plaintiff has further experienced severe emotional and physical distress.

134. Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law. As such, Plaintiff demands punitive damages against Defendants.

**AS A FIRST CAUSE OF ACTION**
**DISCRIMINATION UNDER TITLE VII**

135. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint.

136. This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Section(s) 2000e *et. seq.*, for relief based upon the unlawful employment practices of the Defendant. Plaintiff complains of Defendant's violation of Title VII's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender.

137. Defendant NYU, engaged in unlawful employment practices prohibited by 42 U.S.C. §2000e *et. seq.*, by discriminating against Plaintiff because of her gender (female).

**AS A SECOND CAUSE OF ACTION**
**RETALIATION UNDER TITLE VII**

138. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

139. Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that it shall be unlawful employment practices for an employer:

(1) to . . . discriminate against any of his employees . . . because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

140. Defendant NYU engaged in unlawful employment practice prohibited by Title VII by discriminating against Plaintiff with respect to the terms, conditions or privileges of employment because of their opposition to the unlawful employment practices of Defendant.

## AS A THIRD CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

141. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

142. Executive Law § 296 provides that:

"It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, race, creed, color, national origin, sexual orientation, military status, **sex**, disability, predisposing genetic characteristics, marital status, or domestic violence victim status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

143. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her gender (female).

## AS A FOURTH CAUSE OF ACTION
## RETALIATION UNDER NYSHRL

144. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

145. Executive Law § 296 provides that:

16

"It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

146. Defendant NYU engaged in unlawful discriminatory practices by discriminating against Plaintiff because of her opposition to the unlawful employment practices of Defendant NYU.

## AS A FIFTH CAUSE OF ACTION
## AIDING AND ABETTING UNDER STATE LAW

147. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

148. New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice:

"For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

149. Defendants engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct.

## AS A SIXTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYCHRL

150. Plaintiff repeats, reiterates and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

151. New York City Administrative Code §8-107(1) provides that:

   i.   It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, **gender**, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

17

152. Defendant NYU engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(1)(a) by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her gender (female).

**AS A SEVENTH CAUSE OF ACTION**
**RETALIATION UNDER THE NYCHRL**

153. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

154. The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discharge . . . or otherwise discriminate against any person because such person has requested a reasonable accommodation under this chapter under this chapter..."

155. Defendants violated this section as set forth herein.

**AS AN EIGHTH CAUSE OF ACTION**
**AIDING AND ABETTING UNDER THE NEW YORK CITY ADMINSTRATIVE CODE**

156. Plaintiff repeats, reiterates, and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

157. The New York City Administrative Code Title 8, § 8-107(6) provides that:

> "It shall be unlawful employment practice: "For any person to aid, abet, incite, compel, or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

158. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling and coercing the discriminatory conduct.

**AS A NINTH CAUSE OF ACTION**
**VICARIOUS LIABILITY UNDER THE NYCHRL**

159. Plaintiffs repeat and reallege each and every allegation made in the above paragraphs of this complaint.

160. NYCHRL § 8-107(13) is entitled "Employer liability for discriminatory conduct by employee, agent or independent contractor." It provides that:

(1) An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.

(2) An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where: (1) the employee or agent exercised managerial or supervisory responsibility; or (2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or (3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

(3) An employer shall be liable for an unlawful discriminatory practice committed by a person employed as an independent contractor, other than an agent of such employer, to carry out work in furtherance of the employer's business enterprise only where such discriminatory conduct was committed in the course of such employment and the employer had actual knowledge of and acquiesced in such conduct.

161. Defendant NYU violated the section cited herein as set forth.

**AS A TENTH CAUSE OF ACTION**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(Against DEFENDANT DR. BRENT LLERA)**

162. Plaintiff repeats and realleges each and every paragraph above as if said paragraph was more fully set forth herein at length.

163. Defendant LLERA engaged in an ongoing and continuous pattern of harassment, menacing, stalking, trespass, and violations of privacy.

164. Defendant LLERA'S conduct, which included felonious and/or criminal violations against Plaintiff, were extreme, outrageous, reckless, in reckless disregard for the safety of Plaintiff.

165. As a direct result of Defendant LLERA'S abusive and illegal ongoing campaign against Plaintiff, Plaintiff suffered and continues to suffer extreme emotional distress.

166. Plaintiff's damages are above and beyond "garden variety" emotional distress as Plaintiff is suffering medically and is seeking medical/psychological counseling for her injuries.

167. As a result of Defendant LLERA'S actions, Plaintiff was humiliated, degraded and belittled, suffered a violation of her rights, suffered mental and emotional distress, loss of income/earnings, inconvenience, pain and suffering, extreme financial hardship, humiliation, stress, anxiety, embarrassment, special damages and emotional distress. Plaintiff has also suffered violations of her personal property and confidential medical information, invasions of privacy, violations of her right to bodily integrity, and fear for her safety.

168. Defendant LLERA knew, should have known, and could reasonably foresee that his conduct would cause emotional damage and harm to Plaintiff.

169. Defendant LLERA'S conduct was malicious, willful, outrageous, and conducted with full knowledge of the law.

170. Plaintiff is entitled to the maximum amount of damages allowed under this statute.

## **JURY DEMAND**

171. Plaintiff hereby requests a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by **Title VII of the Civil Rights Act of 1964**, the **New York State Human Rights Law**, and the

20

**New York City Human Rights Law**, in that Defendants subjected Plaintiff to sexual harassment, discrimination, and retaliation;

B. Awarding damages to Plaintiff for all lost wages and benefits, past and/or future, back pay and/or front pay, resulting from Defendants' unlawful employment practices and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C. Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering, and injury to reputation;

D. Awarding Plaintiff punitive damages;

E. Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F. Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated: New York, New York
June 1, 2026

PHILLIPS & ASSOCIATES
ATTORNEYS AT LAW, PLLC

_/s/ Joshua Friedman_
Joshua Friedman, Esq.
*Attorney for Plaintiff*
45 Broadway, 28th Floor
New York, New York 10006
T: (212) 248-7431
F: (212) 901-2107
JFriedman@TPGLaws.com